# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 18-23981-CIV-GAYLES/OTAZO-REYES

IBELISE SANCHEZ,

      Plaintiff,

v.

ANDREW SAUL,[1]
Commissioner of Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE came before the Court upon Plaintiff Ibelise Sanchez's ("Claimant") Motion

for Summary Judgment (hereafter, "Claimant's Motion for Summary Judgment") [D.E. 19] and

Defendant Andrew Saul, Commissioner of Social Security's ("Commissioner") Motion for

Summary Judgment (hereafter, "Commissioner's Motion for Summary Judgment") [D.E. 20]. The

administrative transcript (hereafter, "TR.") has been filed [D.E. 10].[2] For the reasons stated below,

the undersigned respectfully recommends that Claimant's Motion for Summary Judgment be

GRANTED, the Commissioner's Motion for Summary Judgment be DENIED, and the case be

REMANDED to the Commissioner for further proceedings in accordance with this Report and

Recommendation.

## PROCEDURAL HISTORY

In April 2015, Claimant filed applications for a period of disability, disability insurance

---

[1] Andrew Saul became Commissioner of Social Security on June 17, 2019. Pursuant to Federal Rule of Civil Procedure 25(d), Andrew Saul should be substituted for Nancy A. Berryhill as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 405(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] The references hereafter (TR. __) are to the transcript pages rather than the court record pages.

benefits ("DIB"), and supplemental security income ("SSI"), alleging a disability onset date of January 1, 2014.   TR. 203-21, 236.   The applications were denied initially and upon reconsideration.  Id. at 59-114.  Pursuant to a written request, a hearing was held on October 4, 2017 before Administrative Law Judge Rebecca Wolfe ("ALJ Wolfe"), at which Claimant and Vocational Expert Devin Lessne ("VE Lessne") testified.  Id. at 34-58.  On January 17, 2018, ALJ Wolfe issued an Unfavorable Decision, finding that:

(1) Claimant met the insured status requirements of the Social Security Act through December 31, 2018.  Id. at 17.

(2) Claimant had not engaged in substantial gainful activity since January 1, 2014, the alleged onset date (20 C.F.R. §§ 404.1571 et seq. and 416.971 et seq.).  Id.

(3) Claimant had the following severe impairments: migraine headaches, depression, bipolar disorder, and coronary artery disease (20 C.F.R. §§ 404.1520(c) and 416.920(c)).  Id.

(4) Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  Id. at 18.[3]

(5) Claimant had the residual functional capacity (hereafter, "RFC") to perform light work subject to additional limitations.  Id. at 20-21.[4]

(6) Claimant was unable to perform any past relevant work (20 C.F.R. §§ 404.1565

---

[3] The Social Security Administration's ("SSA") Listing of Impairments "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a) and 416.925(a).

[4] The RFC is the ability of a claimant to do physical and mental work activities on a sustained basis, despite the claimant's limitations or impairments. 20 C.F.R. §§ 404.1545(a)(1) and 416.945(a)(1).  The RFC must be determined based on all of the claimant's impairments, even those that are not considered "severe."  See 20 C.F.R. §§ 404.1520, 404.1545, 416.920 and 416.945.

"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. §§ 404.1567(b) and 416.967(b).

and 416.965). <u>Id.</u> at 26.[5]

(7) Claimant was born on September 9, 1967 and was 46 years old, which was defined as a younger individual, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963). <u>Id.</u>

(8) Claimant had a limited education and was able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964). <u>Id.</u>

(9) Transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Claimant was "not disabled," whether or not Claimant had transferable job skills (<u>See</u> SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2). <u>Id.</u>[6]

(10) Considering Claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Claimant could perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)). <u>Id.</u>

(11) Claimant had not been under a disability, as defined in the Social Security Act, from January 1, 2014 through the date of the Unfavorable Decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)). <u>Id.</u> at 27.

On September 18, 2018, the Appeals Council denied a request for review of ALJ Wolfe's Unfavorable Decision. <u>Id.</u> at 1-3. On September 26, 2018, pursuant to 42 U.S.C. § 405(g), Claimant filed this action seeking reversal of ALJ Wolfe's final administrative decision [D.E. 1].

In support of her contention that ALJ Wolfe's Unfavorable Decision should be reversed, Claimant argues that:

I.    The ALJ committed reversible error in failing to set forth the requisite good cause for failing to consider or otherwise rejecting the opinions and assessments of Claimant's treating psychiatrists, and in according too much weight to the opinions of the State Agency reviewing consultant.

II.   The ALJ failed to properly assess Claimant's RFC.

---

[5] "Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. §§ 404.1560(b)(1) and 416.960(b)(1).

[6] SSRs are a series of precedential decisions relating to the programs administered by the SSA and are published under the authority of the Commissioner of Social Security. <u>See</u> http://ssa.gov/regulations/def-ssr.htm.

III.    The ALJ failed to properly assess Claimant's alleged symptoms and limitations.

See Claimant's Motion for Summary Judgment [D.E. 19 at 7-22].

## RELEVANT MEDICAL EVIDENCE

I.    **Treating Sources**

**A.  Manuel A. Garcia, M.D. ("Dr. M.A. Garcia")**

Dr. M.A. Garcia, a psychiatrist, treated Claimant from September 4, 2012 to May 27, 2015. TR. 306-29, 336-43.  On September 4, 2012, Dr. M.A. Garcia performed a complete evaluation of Claimant's psychiatric condition.  Id. at 306.  Claimant reported that she was "very depressed" and was experiencing the following symptoms: anger; decreased energy; difficulty concentrating; fatigue; feelings of guilt; irritability; sadness; insomnia; feelings of worthlessness; and a desire to be dead, for which she convincingly denied intent.  Id.  Claimant denied a history of suicidal or self-injurious behavior.  Id.  Dr. M.A. Garcia noted that: Claimant appeared glum, tense, anxious, and sad; her associations were intact; her thinking was logical; her thought content was appropriate; her social judgment was intact; her cognitive functioning and fund of knowledge were intact and age appropriate; her short and long term memory were intact; her ability to abstract and do arithmetic calculations was intact; she was fully oriented and her insight into illness was fair; she convincingly denied suicidal intentions and homicidal ideas and intentions; and she did not display signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process.  Id. at 306-07.  Claimant was diagnosed with bipolar II disorder, most recent episode depressed; assigned a Global Assessment of Functioning ("GAF") of 50; and prescribed a sedative, an anticonvulsant, and an antidepressant known as a selective serotonin reuptake inhibitor

4

("SSRI"). Id. at 307.[7]

On September 25, 2012, Claimant reported that: she had less energy than before; increased symptoms of anhedonia were present; she continued to feel sad; and her feelings of worthlessness continued unchanged. Id. at 313.   Dr. M.A. Garcia noted that: Claimant had been taking her medication regularly; her behavior had been stable and unremarkable; and she showed "slight treatment response as of today." Id. He also noted that: Claimant appeared glum, tense, anxious and sad; her cognitive functioning and fund of knowledge were intact and age appropriate; her short and long term memory were intact; her ability to abstract and do arithmetic calculation was intact; she was fully oriented; her insight into her problems and social judgment was fair; and she convincingly denied suicidal ideas and homicidal ideas or intentions. Id. Claimant's diagnosis and prescription medications remained unchanged, but the dosages were adjusted. Id.

On October 25, 2012, Claimant "denied all psychiatric problems" and reported that her behavior had been stable and uneventful, and that she had "no psychotic, depressive, or anxiety symptoms." Id. at 315. Dr. M.A. Garcia noted that: Claimant's mood was euthymic with no signs of depression or anxiety; her speech revealed no abnormalities and her language skills were intact; she did not display signs of psychotic process; her behavior was not bizarre; there were no indications that hallucinations or delusions were present; there were no signs of thought disorder; her associations were intact; her thinking was generally logical; her thought content was appropriate; her insight and judgment were intact and normal; her cognitive functioning was

---

[7] "Global assessment of functioning is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. . . .  A GAF of 41-50 indicates either serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning." Vargas v. Astrue, No. 07-CV-60776, 2008 WL 4056164, at *3 (S.D. Fla. Aug. 25, 2008) (alterations in original) (citations and quotations omitted) (citing American Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS TEXT REVISION, 32-34 (4th ed.1994)).

commensurate with her age and abilities; her short and long term memory were intact; her ability to abstract and do arithmetic calculation was intact; and her memory and general cognitive abilities presented as normal and intact. Id. Claimant's diagnosis, prescriptions, and dosages remained unchanged. Id.

On January 9, 2013, Claimant denied psychiatric, psychotic, anxiety, and depressive symptoms and reported that her behavior had been stable and uneventful. Id. at 316. Dr. M.A. Garcia noted that: Claimant's mood was euthymic with no signs of depression or elevation; her language skills were intact; she convincingly denied suicidal ideas; she did not display signs of psychotic process; her behavior was basically appropriate; there were no indications that hallucinations or delusions were present; there were no signs of thought disorder; her associations were intact; her thinking was generally logical; her thought content was appropriate; her insight and judgment were intact and normal; her cognitive functioning was commensurate with her age and abilities; her short and long term memory were intact; her ability to abstract and do arithmetic calculation was intact; and her memory and general cognitive abilities presented as normal and intact. Id. Claimant's diagnosis, prescriptions, and dosages remained unchanged. Id.

On May 22, 2013, Claimant reported that she continued to feel sad and experienced "symptoms of mania intermingled with depressed mood." Id. at 317. Dr. M.A. Garcia noted that Claimant had a partial response to treatment, and that her anhedonia and feelings of worthlessness continued unchanged. Id. He also noted that: Claimant was glum, tense, and anxious; her affect was constricted; she denied having suicidal ideas but wished to be dead and convincingly denied suicidal intentions and homicidal ideas or intentions; her cognitive functioning and fund of knowledge were intact and age appropriate; her social judgment appeared fair; her short and long term memory were intact; she was able to abstract and do arithmetic calculations; she was fully

oriented; and her insight into her problems was fair.  Id.  Claimant's diagnosis and prescriptions remained unchanged but the dosages of her SSRI and anticonvulsant were adjusted.  Id. at 317-18.

On October 2, 2013, Claimant reported that she continued to feel sad and that her sedative was the only medication providing relief.  Id. at 319.  Dr. M.A. Garcia noted that Claimant had a partial response to treatment, and that her anhedonia and feelings of worthlessness continued unchanged.  Id.  He also noted that: Claimant did not display signs of anxiety; her mood was euthymic with no signs of depression or manic process; her speech was normal and her language skills were intact; she convincingly denied suicidal ideas or impulses along with homicidal and assaultive ideas or intentions; she denied hallucinations and delusions; she did not display thought disorder; her associations were intact; her thinking was generally logical; her thought content was appropriate; her cognitive functioning was intact and age appropriate; she was fully oriented; and her insight and judgment appeared intact.  Id.  Claimant's diagnosis, prescriptions, and dosages remained unchanged.  Id.

On December 18, 2013, Claimant convincingly denied symptoms of depression and reported no hallucinations, delusions, or other symptoms of psychotic process.  Id. at 321.  Dr. M.A. Garcia noted that Claimant was improving and that she did not display apparent signs of anxiety.  Id.  He also noted that: Claimant had no apparent serious mental status abnormalities; she did not display signs of depression or mood elevation; her speech was normal and her language skills were intact; she denied suicidal, self-injurious, homicidal and assaultive ideas and intentions; her behavior was appropriate; she denied hallucinations and delusions; her associations were intact; her thinking was logical; her thought content was appropriate; she did not display signs of cognitive difficulty; her memory was intact for recent and remote events; she was oriented to time, place, and person; she displayed a normal attention span; she exhibited no signs of hyperactivity;

and her insight and judgment appeared intact. Id. Claimant's diagnosis remained the same; an antipsychotic was added to her medication regimen; and the dosage of her SSRI was adjusted. Id.

On June 25, 2014, Dr. M.A. Garcia noted that Claimant had a partial response to treatment and that there had been no change in her anhedonia or symptoms of sadness. Id. at 323. He also noted that: Claimant appeared glum, tense, anxious, and fidgety; her affect was constricted; she did not display any apparent signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process; her associations were intact; her thinking was logical; her thought content was appropriate; her cognitive functioning and fund of knowledge were intact and age appropriate; her short and long term memory, and ability to abstract and do arithmetic calculations were intact; she was fully oriented; her insight into her problems was fair; her social judgment appeared fair; and she convincingly denied suicidal ideas or intentions. Id. Claimant's diagnosis remained unchanged; she was assigned a GAF of 50; and she was prescribed a sedative, with an adjusted dosage, an anticonvulsant, and an SSRI. Id.

On November 20, 2014, Claimant reported that she continued to feel sad. Id. at 326. Dr. M.A. Garcia noted that Claimant had a partial response to treatment and that there had been no change in her anhedonia. Id. He also noted that: Claimant appeared glum, tense, and anxious; her insight into her problems was normal; her social judgment appeared intact; and she convincingly denied suicidal ideas and homicidal ideas or intentions. Id. Claimant's diagnosis, GAF, and prescriptions remained unchanged, but the dosage of her SSRI was adjusted. Id.

On February 10, 2015, Claimant reported that she continued to feel sad. Id. at 328. Dr. M.A. Garcia noted that Claimant had a slight response to treatment, and that there had been no change in her anhedonia or feelings of worthlessness. Id. He also noted that: Claimant appeared glum, anxious, and fidgety; her cognitive functioning and fund of knowledge were intact and age

appropriate; her short and long term memory, ability to abstract, and do arithmetic calculations were intact; she was fully oriented; her insight into her problems was normal; her judgment appeared intact; and although she wished to be dead, she denied suicidal plans and homicidal ideas or intentions. Id. Claimant's diagnosis was changed to bipolar I disorder, current or most recent episode depressed, severe; her GAF was unchanged; lithium carbonate and an antidepressant known as a serotonin and norepinephrine reuptake inhibitor ("SNRI") were added to her medication regimen; and the dosage of her SSRI was adjusted. Id.

On March 10, 2015, Dr. M.A. Garcia noted that Claimant was improving, there had been no change in her anhedonia, and she continued to feel sad. Id. at 337. He also noted that: Claimant appeared glum, anxious, and fidgety; her affect was constricted; she did not display signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process; her associations were intact; her thinking was logical; her thought content was appropriate; her cognitive functioning and fund of knowledge were intact and age appropriate; her short and long term memory, ability to abstract, and do arithmetic calculations were intact; she was fully oriented; her insight into her problems was normal; her judgment appeared intact; and she denied suicidal ideas along with homicidal ideas or intentions. Id. Claimant's diagnosis, GAF, and prescriptions remained unchanged, but the dosages of her SNRI and SSRI were adjusted. Id. at 337-38.

On May 12, 2015, Dr. M.A. Garcia noted that Claimant showed a partial response to treatment, and there had been no change in her feelings of worthlessness or anhedonia. Id. at 339. He also noted that: Claimant appeared glum, anxious, and fidgety; her affect was constricted; she did not display signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process; her associations were intact; her thinking was logical; her thought content was appropriate; her cognitive functioning and fund of knowledge were intact and age appropriate; her

short and long term memory, ability to abstract, and do arithmetic calculations were intact; she was fully oriented; her insight into her problems was normal; her judgment appeared intact; and she denied suicidal ideas and homicidal ideas or intentions. Id. Claimant's diagnosis and GAF remained unchanged; and she was prescribed a sedative, an anticonvulsant, an SNRI, with an adjusted dosage, and an antipsychotic. Id. at 339-40.

On May 27, 2015, Claimant reported having "racing" thoughts. Id. at 342. Dr. M.A. Garcia noted that Claimant showed a partial response to treatment, but her problem of decreased sleep and mood irritability were unchanged. Id. He also noted that: Claimant appeared glum, anxious, and fidgety; her affect was constricted; she did not display signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process; her associations were intact; her thinking was logical; her thought content was appropriate; her cognitive functioning and fund of knowledge were intact and age appropriate; her short and long term memory, ability to abstract, and do arithmetic calculations were intact; she was fully oriented; her insight into her problems and judgment were fair; and she denied suicidal ideas and homicidal ideas or intentions. Id. Claimant's diagnosis and GAF remained unchanged, and she was prescribed a different antipsychotic. Id. at 342-43.

## B. Continucare MDHC, LLC ("Continucare")

Claimant received treatment from various physicians at Continucare from March 18, 2013 to November 17, 2016. Id. at 352-54, 358-69, 409-446. On March 18, 2013, Claimant, who was noted to be alert and oriented, complained of a migraine. Id. at 354. Claimant was instructed to continue with over the counter medications and to make an appointment with her primary care physician. Id.

On June 22, 2015, Claimant, who was crying during the visit, was treated by Carlos

Estrada, M.D. ("Dr. Estrada") for a migraine headache. Id. at 368. Claimant reported that she had: tried several medications without success and could not tolerate the side effects; mostly right sided hemicrania that usually lasted three days; and a history of depression and bipolar disorder. Id. Claimant was prescribed a beta-blocker "to reduce the migraine attacks." Id.

On July 29, 2015, Claimant reported that she was suffering from migraines, lasting approximately 3 days, about 2-3 times per month. Id. at 365. Claimant also denied suicidal thoughts, and complained that she had difficulty sleeping and was in a depressed mood. Id. at 366. Wanda Elozegui, M.D. ("Dr. Elozegui") noted that: Claimant was alert and oriented x3, tearful, and withdrawn; she had normal speech; and her mood was depressed and her affect was sad. Id. at 367. Dr. Elozegui also conducted a depression screening using Patient Health Questionnaire-2 (hereafter, the "PHQ-2 Depression Screening"). Id. at 366.[8] It consisted of the following questions: (1) whether Claimant was feeling down, depressed, or hopeless; and (2) whether Claimant felt little interest or pleasure in doing things. Id. Claimant answered in the negative to both questions. Id. Claimant was referred to a neurologist and ophthalmologist for her headaches. Id. at 365.

On August 24, 2015 and October 5, 2015, Claimant complained of headaches. Id. at 361, 437. On both dates, Dr. Elozegui noted that Claimant's neurologic exam was normal and that she answered in the negative when presented with the PHQ-2 Depression Screening. Id. at 360, 363, 436-37.

On December 2, 2015, Claimant, who was noted to be alert and oriented, was treated for a

---

[8] "The Patient Health Questionnaire ("PHQ-2") 'inquires about the degree to which an individual has experienced depressed mood and anhedonia over the past two weeks. Its purpose is not to establish final diagnosis or to monitor depression severity, but rather to screen for depression." Irene v. Berryhill, No. 18-CV-00038, 2019 WL 1349560, at *11 n.19 (N.D.N.Y. Mar. 26, 2019) (citing American Psychological Ass'n, PATIENT HEALTH QUESTIONNAIRE (PHQ-9 & PHQ-2), https://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/patient-health).

rash. Id. at 434.

On February 2, 2016, Claimant denied headaches, but Dr. Elozegui noted that Claimant's migraines were symptomatic at the time. Id. at 428-29. Dr. Elozegui also noted that: Claimant's neurologic exam was normal; and that she responded in the negative when presented with the PHQ-2 Depression Screening. Id. at 430, 433. For her headaches, Claimant was prescribed a beta-blocker; injected with a nonsteroidal anti-inflammatory drug ("NSAID"); and referred to the University of Miami's Departments of Neurology and Ophthalmology. Id. at 428, 430.

On October 5, 2015, Claimant denied headaches. Id. at 359. Dr. Elozegui noted that Claimant's neurologic exam was normal and that she responded in the negative when presented with the PHQ-2 Depression Screening. Id. at 358-59.

On March 16, 2016, Claimant was treated for an earache secondary to a cold. Id. at 426-27. Dr. Estrada noted that Claimant was oriented and alert, and that the beta-blocker had reduced the frequency of her migraines to once a month. Id. at 426.

On May 20, 2016, Claimant denied headaches. Id. at 425. Dr. Elozegui noted that Claimant's neurologic exam was normal and that she responded in the negative when presented with the PHQ-2 Depression Screening. Id. at 424-25. Dr. Elozegui also noted that Claimant's migraines were "better with [the] new regimen," and that her bipolar disorder was stable. Id. at 424.

On July 27, 2016, Claimant complained of headaches. Id. at 423. Dr. Elozegui noted that: Claimant's neurologic exam was normal; her recurring migraines were "untractable"; and her bipolar disorder was stable. Id. at 422-23. Dr. Elozegui also noted that Claimant was waiting for approval from her insurer to begin Botox treatments for her migraines. Id. at 422.

On November 1, 2016, Claimant complained of headaches. Id. at 417. Paul Gipps, M.D.

("Dr. Gipps") noted that: Claimant's neurologic exam was normal; her bipolar disorder was stable; and she was tearful and anxious. Id. at 416, 421. Claimant answered in the affirmative when presented with the PHQ-2 Depression Screening, which resulted in Dr. Gipps continuing Claimant's depression screening by utilizing Patient Health Questionnaire-9 (hereafter, "PHQ-9 Depression Screening"). Id. at 416-17.[9] Claimant's total score on the PHQ-9 Depression Screening was a 6, which was interpreted as mild depression. Id. at 416-17.

On November 17, 2016, Claimant complained of headaches. Id. at 410. Dr. Gipps noted that: Claimant was tearful and anxious; her bipolar disorder was stable; and she answered in the negative when presented with the PHQ-2 Depression Screening. Id. at 409, 414.

### C. Baptist Medical Plaza at Tamiami Trail Urgent Care ("Baptist Urgent Care")

On August 4, 2015, Claimant sought treatment at Baptist Urgent Care due to recurring migraine headaches. Id. at 345. After being examined, Claimant was instructed not to work for two days and prescribed a narcotic and an antiemetic. Id.

### D. Jackson Health System - Jackson South Behavioral Health ("JSBH")

Claimant was involuntarily admitted to JSBH via the emergency room on October 13, 2015 and discharged on October 16, 2015. Id. at 380-402. Claimant was admitted to the inpatient psychiatric unit for exacerbation of her depression and because she reported suicidal ideas. Id. at 385, 393, 399.

At admission, Claimant reported that she experienced: severe symptoms of depression and anxiety; decreased energy; anhedonia; feelings of hopelessness; and wishes to die, which she attributed to her migraine headaches, "as well as other personal problems." Id. at 381. It was also

---

[9] "The PHQ-9 . . . is a nine-item scale that is self-administered and is used to screen patients for depression. . . . [A score of] 5-9 indicates mild depression . . . ." Lucero v. Colvin, No. 15-CV-0434, 2016 WL 8230654, at *6 n.12 (D.N.M. Aug. 17, 2016) (citations omitted).

noted that: Claimant had a long history of mental illness; she suffered from emotional or behavioral disorder; her living situation was "[h]ome independently"; and she would not need assistance at home upon discharge. Id. at 393, 398, 400. Claimant's affect/behavior was recorded as: cooperative, crying, loneliness, fearful, and sad/depressed. Id. at 401.

On October 14, 2015, Claimant was seen by Damian Diaz-Cotelo, M.D. ("Dr. Diaz") for management of her migraine headaches. Id. at 383. Claimant denied suicidal or homicidal thoughts and reported that she had suffered a migraine headache the night prior, which improved after receiving medication. Id. at 384-85. Prior to that instance, Claimant's last migraine episode was on October 1, 2015, which lasted 5 days and coincided with her menstrual period. Id. at 384. Dr. Diaz's physical examination revealed that Claimant was: not in active distress; not experiencing a headache at that time; oriented x3 with no motor or sensory deficit; and still very depressed and easily tearful. Id. at 385. For management of her headaches, Claimant was instructed to take an analgesic, a beta-blocker, and an anticonvulsant. Id.

On October 14, 2015, Claimant's status at JSBH was changed from involuntary to voluntary. Id. at 393.

On October 15, 2015, Claimant was seen by Robert Hernando, M.D. ("Dr. Hernando"), a psychiatrist. Id. at 392. During that visit, Dr. Hernando noted that Claimant: appeared awake, and alert and oriented x3; did not present any signs of agitation or distress, or delusions or hallucination; and had no passive or active suicidal, homicidal ideations or plans. Id. Claimant advised that her medication was working and that she felt less hopeless and nervous as compared to when she was admitted. Id.

An October 15, 2015 progress note documented that Claimant: denied suicidal and homicidal ideations or plans; had a long history of mental illness but was not receiving outpatient

treatment; and felt sad and depressed, but appeared calm and cooperative and was able to share her personal information. Id. at 397.

During the course of her hospitalization, Claimant was noted to have: gradually improved; presented a more adequate and appropriate mood and affect, as well as thought process and content; participated in group and recreational activities without any management problem; and taken medications without experiencing side effects. Id. at 382.

Claimant was discharged home on October 16, 2015 in stable condition. Id. at 394, 397. At discharge, Claimant: was assigned a GAF of 55;[10] denied suicidal or homicidal ideation; was noted to be very pleasant and cooperative; denied delusions and hallucinations; was not in distress; and wanted to be discharged to be reunited with her family. Id. at 381-82, 394.

### E.  Manuel E. Garcia, M.D. ("Dr. M.E. Garcia")

Dr. M.E. Garcia, a psychiatrist, treated Claimant from November 30, 2015 to May 23, 2017. TR. 376-79, 526-32.  On November 30, 2015, Claimant reported that she: suffered from continued depression which had not improved despite her compliance with treatment; cried all the time; had a lack of energy and could not get out of bed or work; was diagnosed with bipolar disorder in 2002; suffered from migraine headaches; had racing thoughts and mood swings; and had manic episodes that lasted 24 hours. Id. at 532.  Dr. M.E. Garcia noted that Claimant: was alert and oriented x3; had clear speech; was tearful; exhibited mood swings and racing thoughts; had decreased concentration and was forgetful; and has had suicidal ideations. Id.  Claimant was diagnosed with bipolar disorder and depression; and prescribed two anticonvulsants, a sedative, and an SNRI. Id.

---

[10] A GAF of 51-60 "is indicative of moderate symptoms such as moderate difficulties with social, occupational, or school functioning." Norris v. Colvin, 160 F. Supp. 3d 1251, 1268 (E.D. Wash. 2016) (citing American Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 32 (4th ed.1994)).

On January 26, 2016, Claimant's husband, who accompanied her on that visit, reported that: Claimant seemed very depressed lately; her depression was stronger; and she had 2 manic episodes one month prior and had been depressed since then. Id. at 531. Claimant reported feeling guilty because she could not work as an accountant and denied suicidal and homicidal ideations. Id. Dr. M.E. Garcia noted that Claimant: cried throughout the session and did not make eye contact; had a low energy level; and was sleeping well with one of the anticonvulsants, Depakote. Id. Claimant was instructed to continue taking her medications as prescribed but the dosage of her SNRI was adjusted. Id.

On February 28, 2016, Claimant reported that: she had experienced rapid mood swings the prior weekend; she experienced migraine headaches on the day of that visit; and the frequency of her migraines had decreased to 2 or 3 times per month, which she attributed to Depakote. Id. at 526. Claimant also denied having suicidal or homicidal ideations. Id. Dr. M.E. Garcia noted that Claimant was doing poorly and instructed her to continue taking her medications as prescribed. Id.

On April 19, 2016, Claimant, reported that she: recently experienced 15 days of "non stop" hyperactivity and was now depressed; and had been compliant with her medications which resulted in her migraine headaches stopping for 15 days, but then she experienced 3 days of migraine headaches the prior weekend. Id. at 378. Dr. M.E. Garcia noted that Claimant cried and was tearful during the session; and instructed her to continue with her medications as prescribed, but adjusted the dosage of her SNRI. Id.

On June 14, 2016, Claimant, reported that she: felt "well" for 15 days but then became depressed; and did not feel well during the session because of a migraine. Id. at 377. Dr. M.E. Garcia noted that Claimant: was still depressed, withdrawn, and non-functional; and displayed

16

poor eye contact. Id. Claimant was encouraged to walk; and instructed to continue with her prescribed medications, but the dosage of one of her anticonvulsants was adjusted. Id.

On September 13, 2016, Claimant, complained of increased anxiety and depression. Id. at 528. Claimant also reported that she: felt like crying; cried and screamed for no reason the prior night; was not experiencing suicidal or homicidal ideations; and "noticed a good change with the Depakote." Id. Dr. M.E. Garcia noted that she was doing poorly; and instructed her to continue taking her prescribed medications, along with a sedative for her anxiety. Id.

On December 7, 2016, Claimant: complained of migraine headaches; reported that she was still depressed; and denied suicidal and homicidal ideations. Id. at 527. Dr. M.E. Garcia noted that Claimant was tearful and had a blunted affect during the session. Id. Claimant was instructed to continue with her prescribed medications, but the dosage of one of her anticonvulsants was adjusted. Id.

On May 23, 2017, Claimant cried during the visit and reported that she: was unable to handle house chores; felt helpless and hopeless; could not work; had "negativistic thoughts"; had had suicidal thoughts with no plans; and would forget to turn off the stove. Id. at 526. Claimant also denied suicidal and homicidal ideations and advised that her mood swings were better controlled. Id. Dr. M.E. Garcia noted that Claimant: was not doing well; was very depressed; did not make eye contact during the session; was unable to function; was not responding to her medications "in spite of the high dosages"; cried for no reason; had nightmares and short-lasting manic episodes; and might need to be hospitalized if there were no changes. Id. Claimant was instructed to continue taking her medications as prescribed, along with an SSRI. Id.

On July 19, 2017, Dr. M.E. Garcia completed a Medical Assessment of Ability to do Work-Related Activities (Mental) relating to Claimant's condition (hereafter, "Medical Assessment").

Id. at 554-55. In that document, Dr. M.E. Garcia indicated that Claimant's ability to function in the following areas was seriously limited but not precluded: follow work rules; relate to co-workers; deal with public; use judgment; interact with supervisors; deal with work stress; function independently; maintain attention/concentration; understand, remember, and carry out complex job instructions; understand, remember, and carry out detailed, but not complex, job instructions; understand, remember, and carry out simple job instructions; maintain personal appearance; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability. Id. at 554-55. Dr. M.E. Garcia further opined that Claimant was "unable to function in a work[-]related setting" and that her "thought process [was] very poor." Id. at 555. He cited her anhedonia and isolative traits in support of his findings. Id. He also noted that her mood swings and past suicidal thoughts would impact her ability to perform work-related activities. Id.

### F. Hong Jiang, M.D., Ph.D. ("Dr. Jiang")

Claimant was treated by Dr. Jiang, a clinical assistant professor of Neuro-ophthalmology and Neurology at the University of Miami, from December 21, 2015 to March 7, 2017. Id. at 450-59, 465-67, 480-85, 500-25. On December 21, 2015, Claimant underwent a neurology evaluation. Id. at 457. Claimant complained of a worsening migraine headache and reported that: since the age of 7, she had suffered from left side throbbing headaches associated with light sensitivity and movement; that just prior to the visit, she only had occasional headaches, but that in the past several months, she had severe headaches almost daily, which often woke her up from her sleep. Id. Dr. Jiang noted that Claimant: was awake, alert, and oriented x3; had intact language; did not exhibit feelings of anxiety, or emotional instability; and suffered from poor sleep. Id. at 457-58. To treat Claimant's headaches, Dr. Jiang recommended that she: undergo imaging studies of her brain to rule out intracranial lesions; and add magnesium and vitamin B2 to the list of medications she was

already taking, along with a triptan as needed. Id. at 459.[11]

On December 31, 2015, Claimant underwent magnetic resonance imaging ("MRI") of her brain. Id. at 491-92. Dr. Jiang found the results to be unremarkable. Id. at 454.

On March 28, 2016, Claimant reported that: she was "very much depressed" because of frequent severe migraine headaches that lasted for 3 days, which she had 3 to 4 times a month; she had mild headaches in between severe headaches; and her medications were not providing relief. Id. at 454. Dr. Jiang noted that: Claimant exhibited feelings of anxiety but not emotional instability; she was in tears because of her headaches; she was awake, alert, and oriented x3; her language was intact; and, in addition to her medications, she should begin Botox treatments in 3 weeks if approved by her insurance. Id. at 454-56. Claimant was prescribed an antidepressant for headache prevention. Id. at 456.

On August 1, 2016, Claimant reported that: she could not afford Botox treatments because of a high co-pay; she had severe migraine headaches at least 4 days a week; and her medications were not providing relief. Id. at 465. Dr. Jiang noted that Claimant: was awake, alert, and oriented x3; had intact language; exhibited feelings of anxiety and emotional instability; and suffered from poor sleep. Id. at 465-67. Claimant was instructed to continue her medications, along with a calcium-channel blocker for headache prevention. Id. at 467.

On September 26, 2016, Claimant reported that: her headaches had improved; and, on average, she suffered from headaches on 15 days of the month, and 7 to 8 headaches were severe enough to require medication, specifically Maxalt, a triptan, with Naproxen, an NSAID. Id. at 450. Dr. Jiang noted that Claimant: was awake, alert, and oriented x3; had intact language; and

---

[11] "Drugs called triptans have been designed especially for migraine attacks. Their main effect is to reduce pain information coming to the brain." The Migraine Trust, ACUTE MEDICINES, https://www.migrainetrust.org/living-with-migraine/treatments/acute-medicines/ (last visited November 15, 2019).

exhibited feelings of anxiety and emotional instability.  Id. at 450-52.  Claimant was instructed to continue taking her medications as prescribed.  Id. at 452.

On October 31, 2016, Claimant reported that "[h]er headache [had] been stable," and that she had headaches more than 15 times a month.  Id. at 516.  Dr. Jiang noted that Claimant: exhibited feelings of anxiety and emotional instability; was awake, alert, and oriented x3; and had intact language.  Id. at 517-18.  For headache relief, Dr. Jiang: instructed Claimant to continue her regimen of medications; adjusted the dosage of her calcium-channel blocker; and prescribed a sedative, on an as needed basis for anxiety and severe migraine attacks.  Id. at 519.

On March 7, 2017, Claimant reported that: her headaches had been stable; she had headaches on more than 15 days in a month; and Maxalt had helped relieve her headaches, but she had not had that medication for two months and suffered from constant daily headaches as a result. Id. at 521-22.  Dr. Jiang noted that Claimant: was awake, alert, and oriented x3; exhibited feelings of anxiety and emotional instability; and had intact language.  Id. at 522-523.  Dr. Jiang instructed Claimant to continue with her regimen of prescribed medications, along with a sedative for anxiety and severe migraine attacks, and another triptan for headache relief.  Id. at 523-24.

On September 5, 2017, Dr. Jiang completed a Medical Statement Regarding Headaches for Social Security Disability Claim (hereafter, "Medical Statement") on Claimant's behalf.  Id. at 557.  In the Medical Statement, Dr. Jiang opined that: (1) Claimant suffered from disabling chronic migraine headaches; and (2) Claimant was not able to work while suffering a headache.  Id. at 558.

## II.     Non-Treating Sources

### A. State Agency Psychological Consultant Judith E. Meyers, Psy.D. ("Dr. Meyers")

On July 21, 2015, Dr. Meyers diagnosed Claimant with a severe impairment of affective disorders.  Id. at 74.  Dr. Meyers opined that Claimant had: mild restrictions in her activities of

daily living; moderate restrictions in maintaining social functioning and maintaining concentration, persistence, or pace; no repeated episodes of decompensation, each of extended duration; and the capacity to persist at simple tasks within physical tolerances, and adapt adequately in the work environment. Id. at 74, 76-77. Dr. Meyers also opined that Claimant would function best at tasks with little to no social demands for communicating with others. Id. at 77.

### B.  State Agency Psychological Consultant Jennifer Meyer, Ph.D. ("Dr. Meyer")

On September 29, 2015, Dr. Meyer diagnosed Claimant with severe impairments of affective disorders and migraine. Id. at 88. Dr. Meyer opined that Claimant had: mild restrictions in her activities of daily living; moderate restrictions in maintaining social functioning and maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration. Id. at 89. Dr. Meyer also opined that Claimant would: likely have difficulty understanding and remembering complex instructions, although she appeared fully capable of recalling simple work procedures and instructions; likely have problems carrying out detailed instructions, maintaining sustained attention/concentration, and completing work tasks at a consistent pace; seemed capable of working without excessive supervision or assistance, working with others, and sustaining attention to complete simple and repetitive tasks for 2-hour segments over an 8 hour work day; would perform best in settings that required minimal social interaction, especially with unfamiliar persons; and would have difficulty appropriately responding to changes in high-stress and fast paced-work environments, but appeared capable of adapting to simple/gradual changes in the work environment. Id. at 91-93.

### HEARING TESTIMONY

A hearing was held on October 4, 2017 before ALJ Wolfe, at which Claimant and VE

Lessne testified.  <u>Id.</u> at 34-58.

  **I.**  **Claimant**

  Claimant testified that she last worked in January of 2014, and that her work history included the following occupations: tax preparer, secretary, and stocker.  <u>Id.</u> at 47-49.

  Claimant classified the strength of her chronic migraine headaches as an 8/10 or 9/10 and testified that they lasted, on average, 72 hours.  <u>Id.</u> at 49.  Claimant explained that, when she experiences a headache, she "remain[s] in a dark room," doesn't like for people to speak with her, and puts ice behind her head until the pain subsides.  <u>Id.</u>

  Claimant testified that she was taking Rizatriptan, a triptan, with Naproxen, an NSAID, to alleviate her migraine headaches.  <u>Id.</u> at 49-50.  However, Claimant testified that her doctors had advised that she could not take more than eight pills, for her headaches, in a month.  <u>Id.</u> at 50.

  Claimant also testified that she was seeing a psychiatrist for her depression.  <u>Id.</u> at 51.  During those sessions, Claimant reported that: she felt worthless; she was a burden to her family; and she wanted to cry all the time.  <u>Id.</u>  Claimant further testified that, as a result of her depression: she experienced confusion; an inability to concentrate; and an inability to recall.  <u>Id.</u>  Claimant testified that, when she does not suffer from headaches, she: lays down; deals with depression; stays home; and doesn't "feel like doing things."  <u>Id.</u>  at 51-52.

  While discussing household chores, Claimant, who lived with her husband, adult children, and father, explained that her husband, one child, and mother would assist with the chores.  <u>Id.</u>  Claimant testified that her mother would also help her cook.  <u>Id.</u> at 52.

  **II.**  **VE Lessne**

  VE Lessne classified Claimant's prior work as follows:

> ➤ Telephone operator, DOT #235.662-022,[12] with an exertional level of sedentary[13] and a Specific Vocational Preparation (hereafter, "SVP") of 4.[14] Id. at 54.

> ➤ Stock clerk, DOT #299.367-014, with an exertional level of heavy[15] and an SVP of 4. Id.

> ➤ Tax preparer, DOT #219.362-070, with an exertional level of sedentary and an SVP of 4. Id.

ALJ Wolfe posed three hypotheticals to VE Lessne regarding an individual of Claimant's

age, education, and work experience who:

1.) could work at the light exertional level with the following limitations: the individual should not be exposed to hazardous machinery, mechanical parts, or unprotected heights; should not be exposed to fumes, odors, dust, or other pulmonary irritants or loud noises; is frequently able to respond to changes and demands in a routine work setting; is frequently able to interact with the public; in the workplace, requires limited interaction with others and performs best when the work deals primarily with objects rather than people; is able to complete simple, routine, and repetitive tasks, but not at a production rate or pace; is frequently able to ignore or avoid distractions including psychologically based symptoms while working and while working with others without interrupting or distracting them; and can maintain concentration for at least two hours at a time but might be off-task five minutes an hour.

2.) had the same abilities as the individual Hypothetical No. 1, except that this individual would be absent two or more days in a typical month due to migraines.

---

[12] DOT is the acronym for the Dictionary of Occupational Titles, which was created by the Employment and Training Administration and groups jobs based on their similarities, and defines the structure and content of all listed occupations.  See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.
[13] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).
[14] SVP is defined in the DOT as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.
  An SVP of 4 means that preparation for the job should take "over 3 months up to and including 6 months." Id.
[15] "Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds." 20 C.F.R. §§ 404.1567(d), 416.967(d).

> 3.) had the same abilities as the individual in Hypothetical No. 2, except that this individual would also require unscheduled breaks in addition to the typical breaks normally permitted by employers such that the individual might be off-task a minimum of 10 minutes an hour due to various symptoms.

Id. at 55-56.

VE Lessne testified that the individual in Hypothetical No. 1 would be unable to perform Claimant's past work, but would be able to perform the following representative jobs:

> ➤ Marker, DOT #209.587-034, with an exertional level of light and an SVP of 2,[16] with approximately 304,000 jobs in the national economy;

> ➤ Checker I, DOT #222.687-010, with an exertional level of light and an SVP of 2, with approximately 35,000 jobs in the national economy; and

> ➤ Router, DOT #222.587-038, with an exertional level of light and an SVP of 2, with approximately 52,000 jobs in the national economy.

Id. at 55-56.  VE Lessne testified that: the jobs available to the individual in Hypothetical No. 1 would not be available to the individual in Hypothetical No. 2; and the individual in Hypothetical No. 3 would not be employable in the national economy.  Id. at 56.

ALJ Wolfe then advised VE Lessne that Dr. M.E. Garcia had found that Claimant had "poor" ability to: follow work rules; relate to coworkers; deal with public; use judgment; interact with supervisors; deal with work stress; function independently; maintain concentration; maintain personal appearance; behave in an emotionally stable manner; relate predictability in social situations; and demonstrate reliability. Id. at 56-57.[17] VE Lessne answered in the negative when asked "if an individual had a poor ability to do any of these things would they be employable in the national economy[.]" Id.

---

[16] An SVP of 2 means that preparation for the job should take "[a]nything beyond short demonstration up to and including 1 month." See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.
[17] ALJ Wolfe explained to VE Lessne that "poor" was defined as, "the ability to function in the area is seriously limited but not precluded." TR. 56.

Finally, VE Lessne testified that an individual who was unable to complete an eight-hour workday due to headaches lasting several hours would not be employable in the national economy. <u>Id.</u> at 57.

## STANDARD OF REVIEW

A federal court's "review of a social security case is demarcated by a deferential reconsideration of the findings of fact and exacting examination of the conclusions of law." <u>Williams v. Astrue</u>, 416 F. App'x 861, 862 (11th Cir. 2011).  Thus,

> [t]he Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.

<u>Kieser v. Barnhart</u>, 222 F. Supp. 2d 1298, 1305 (M.D. Fla. 2002) (citations omitted).  However, the Commissioner's "conclusions of law, including applicable review standards, are not presumed valid."  <u>Williams</u>, 416 F. App'x at 862.

## REGULATORY FRAMEWORK:  THE FIVE-STEP SEQUENTIAL PROCESS

The Social Security Regulations outline a five-step "sequential" evaluation process used to determine whether a claimant is disabled.

First, the ALJ must determine whether a claimant is engaged in "substantial gainful activity" (hereafter, "SGA").  If the ALJ finds that the claimant is engaging in SGA, then the ALJ must find that the claimant is not disabled.  <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1237 (11th Cir. 2004).  In this case, ALJ Wolfe determined that Claimant had not engaged in SGA since the alleged onset date of January 1, 2014, and proceeded to step two.  TR. 17.

At the second step, the ALJ must determine if a claimant's impairments are "medically

severe." If the ALJ determines that the claimant's impairments are medically severe, then he or she must proceed to the third step. Phillips, 357 F.3d at 1237. In this case, ALJ Wolfe found that Claimant suffered from the following severe impairments: migraine headaches, depression, bipolar disorder, and coronary artery disease. TR. 17-18. ALJ Wolfe then proceeded to step three. Id. at 18.

At step three, the ALJ must determine if a claimant's impairment(s) "meet or equal" any of the listed impairments in the regulations. Phillips, 357 F.3d at 1238. If so, the ALJ must find the claimant disabled; if not, then the ALJ should proceed to step four. Id. Here, ALJ Wolfe determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. TR. 18-20. Therefore, ALJ Wolfe proceeded to step four. Id. at 20-21.

Step four is a two-pronged process, which first requires the determination of a claimant's RFC and then, based on that RFC, a determination of whether the claimant can return to any "past relevant work." Phillips, 357 F.3d at 1238. As to the first prong, ALJ Wolfe determined that Claimant had the RFC to:

> perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except she can never be exposed to hazardous machinery/mechanical parts, unprotected heights, fumes, odors, dust, irritants, or loud noise. The claimant is frequently able to respond to changes and demands in a routine work setting; and able to interact with the public. She can frequently interact with the public, and performs best when work deals primarily with objects rather than people. The claimant is able to complete simple, routine, repetitive tasks, but not at a production rate or pace. She is able to frequently ignore or avoid distractions, including psychologically based symptoms while working, and while working with others without interrupting or distracting them. The claimant can maintain concentration for at least two hours at a time, but may be off task for 5 minutes per hour.

TR. 20-21. ALJ Wolfe moved to prong two of step four and concluded that Claimant was unable to perform any past relevant work. Id. at 26. ALJ Wolfe then proceeded to the fifth and final step.

Id. at 26-27.

Step five requires the ALJ to determine whether the claimant is able to do any work considering the claimant's age, education, work experience, and RFC. Phillips, 357 F.3d at 1239-40. ALJ Wolfe determined that, given Claimant's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy which Claimant could perform. TR. 26-27. Therefore, ALJ Wolfe concluded that Claimant was not under a disability, as defined in the Social Security Act, since April 10, 2014. Id. at 27.

## DISCUSSION

Claimant argues that:

I.   The ALJ committed reversible error in failing to set forth the requisite good cause for failing to consider or otherwise rejecting the opinions and assessments of Claimant's treating psychiatrists, and in according too much weight to the opinions of the State Agency reviewing consultant.[18]

II.   The ALJ failed to properly assess Claimant's RFC.

III.   The ALJ failed to properly assess Claimant's alleged symptoms and limitations.

See Claimant's Motion for Summary Judgment [D.E. 19 at 7-22]. The undersigned finds merit in all three arguments.

**I.   Whether the ALJ committed reversible error in failing to set forth the requisite good cause for failing to consider or otherwise rejecting the opinions and assessments of Claimant's treating psychiatrists.**

"An ALJ must evaluate every medical opinion received and assign weight to each opinion."

---

[18] Because Claimant fails to present any argument regarding the weight attributed by ALJ Wolfe to the State Agency reviewing consultant's medical opinions, the undersigned will not address that issue, which was only identified in the Table of Contents and Issues sections of Claimant's Motion for Summary Judgment, but was not discussed. See Claimant's Motion for Summary Judgment [D.E. 19 at 2, 7]; see also Preston v. Berryhill, No. 17-CV-41, 2018 WL 1024160, at *10 (N.D. Fla. Feb. 7, 2018), report and recommendation adopted, No. 17-CV-41, 2018 WL 1023361 (N.D. Fla. Feb. 22, 2018) (finding that failure to "properly develop an issue for the Court to review and rule upon" results in waiver of the argument).

<u>Lara v. Comm'r of Soc. Sec.</u>, 705 F. App'x 804, 811 (11th Cir. 2017) (citing 20 C.F.R. § 416.927(c)). "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981).

"An administrative law judge is obligated to assign a weight only to a statement that constitutes a medical opinion." <u>Romero v. Comm'r of Soc. Sec.</u>, 752 F. App'x 906, 908 (11th Cir. 2018) (citing <u>Sharfarz v. Bowen</u>, 825 F.2d 278, 279 (11th Cir. 1987)). Medical opinions are defined as: "statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1). "Treatment notes may qualify as medical opinions, depending on their content." <u>Burnham v. Berryhill</u>, No. 16-CV-63013, 2018 WL 1709714, at *8 (S.D. Fla. Mar. 7, 2018) (citing <u>Winschel v. Comm'r of Soc. Sec.</u>, 631 F.3d 1176, 1179 (11th Cir. 2011)).

When weighing medical opinions, "the ALJ should consider the following factors: the examining and treatment relationship between the claimant and doctor; the supportability and consistency of the opinion with the record as a whole; the specialization of the doctor; and other factors that tend to support or contradict the opinion." <u>Hand v. Soc. Sec. Admin., Comm'r</u>, No. 18-CV-14147, 2019 WL 4447206, at *3 (11th Cir. Sept. 17, 2019) (citing 20 C.F.R. § 404.1527(c)). "Generally, a treating source's opinion is given 'substantial or considerable weight unless good cause is shown to the contrary." <u>Lara</u>, 705 F. App'x at 811 (quoting <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997)). Good cause exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3)

treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips, 357 F.3d at 1241 (citing Lewis, 125 F.3d at 1440). "If the ALJ gives less than controlling weight to a treating source's opinions, the ALJ must clearly articulate the reasons for doing so." Lara, 705 F. App'x at 811. "When the ALJ has articulated specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error." Weekley v. Comm'r of Soc. Sec., 486 F. App'x 806, 808 (11th Cir. 2012) (citing Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005)).

Claimant argues that ALJ Wolfe erred by failing to assign a weight to the medical opinions found in Drs. M.A. Garcia and M.E. Garcia's treatment notes, and by assigning "little weight" to the medical opinions found in Dr. M.E. Garcia's Medical Assessment. See Claimant's Motion for Summary Judgment [D.E. 19 at 8-16].

The Commissioner argues that ALJ Wolfe's failure to assign a weight to the medical opinions found in Drs. M.A. Garcia and M.E. Garcia's treatment notes was harmless. See Commissioner's Motion for Summary Judgment [D.E. 20 at 9-12]. Because Dr. M.A. Garcia's medical opinions were consistent with Claimant's mental RFC, the undersigned finds that ALJ Wolfe's failure to assign a weight to those medical opinions was indeed harmless. TR. 19-21, 306-29, 336-43; see Sarria v. Comm'r of Soc. Sec., 579 F. App'x 722, 724 (11th Cir. 2014) (An ALJ's failure to assign a weight to a treating physician's medical opinions is harmless when "those opinions were consistent with the findings about [the claimant's] mental [RFC].") (citing Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983)).

Dr. M.E. Garcia's treatment notes contained medical opinions finding that Claimant: had decreased concentration; was forgetful; had a low energy level; was doing poorly; was non-functional and unable to function; was not responding to medications "despite high dosages"; had

short-lasting manic episodes; and would need to be hospitalized if her condition did not improve. TR. 376-79, 526-32. Yet ALJ Wolfe found that Claimant was able to: "frequently ignore or avoid distractions, including psychologically based symptoms while working, and while working with others without interrupting or distracting them"; and "maintain concentration for at least 2 hours at a time, but may be off task for 5 minutes per hour." Id. at 20-21. Because the medical opinions found in Dr. M.E. Garcia's treatment notes are not consistent with Claimant's mental RFC, the undersigned recommends that the case be remanded to the Commissioner to expressly weigh the medical opinions found in Dr. M.E. Garcia's treatment notes. See Kalita v. Comm'r of Soc. Sec., No. 15-CV-355, 2016 WL 3189043, at *4 (M.D. Fla. June 8, 2016).

Next, Claimant argues that ALJ Wolfe improperly discounted the medical opinions found in Dr. M.E. Garcia's Medical Assessment by assigning them "little weight" rather than "controlling weight." See Claimant's Motion for Summary Judgment [D.E. 19 at 11-16]. ALJ Wolfe stated:

> I give little weight to treating psychiatrist Dr. Manuel E. Garcia, MD who, on July 19, 2017, opined the claimant was unable to function in a work related setting, and had poor ability to understand remember and carry out simple, detailed or complex job instructions; follow work rules and deal with stress; use judgment; maintain attention/concentration; interact with supervisors, co-workers and the public; and make personal/social adjustments. The opinions are considered because of Dr. Garcia's treatment and direct observations of the claimant. However, the opinion is not supported by his consistently benign findings reflected in 5 years of treatment notes, including a moderate GAF rating assignment of 50. It also appears that Dr. Garcia may have relied heavily on the claimant's self-reports in drafting the opinion. Therefore, I find that this opinion merits only little weight.

TR. 25 (citations omitted).

In explaining her rationale for affording "little weight" to the medical opinions found in Dr. M.E. Garcia's Medical Assessment, ALJ Wolfe incorrectly relied on Dr. M.A. Garcia's treatment notes and medical opinions, as demonstrated by the following: Dr. M.A. Garcia, not Dr.

M.E. Garcia, assigned Claimant a GAF; "5 years of treatment notes" encompassed the entirety of Claimant's treatment by both psychiatrists; and ALJ Wolfe's record citations are to both Dr. M.A. Garcia's and Dr. M.E. Garcia's treatment notes. Id. at 25, 306-29, 336-43, 376-79, 526-32.

Moreover, there are distinct differences in the treatment notes from the two treating psychiatrists. Dr. M.A Garcia: (1) treated Claimant for nearly 3 years, encompassing the time period preceding Claimant's disability onset date and involuntary admission to JSBH, which ALJ Wolfe characterized as the "nadir" of Claimant's mental health status; (2) documented Claimant's thinking as logical, her thought content as appropriate, and her judgment as intact, and noted that she was fully oriented, and had normal insight into her problems; and (3) made no reference to Claimant's migraine headaches. TR. 306-29, 336-43. Dr. M.E. Garcia: (1) began treating Claimant after her involuntary admission to JSBH; and (2) documented that Claimant had decreased concentration, was forgetful, suffered from migraine headaches, was doing poorly, was non-functional, and was not responding to her medications. Id. at 376-79, 526-32.

As discussed above, 20 C.F.R. §§ 404.1527(c), 416.927(c) expressly state that the following factors are to be considered when weighing medical opinions: the examining relationship; the treatment relationship; the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; the amount of relevant evidence to support a medical opinion; the medical opinion's consistency with the record as a whole; a physician's specialization; and "other factors." See 20 C.F.R. §§ 404.1527(c), 416.927(c).

Given ALJ Wolfe's conflation of the treating psychiatrists' treatment notes, which are starkly different, the undersigned concludes that ALJ Wolfe's discounting of the medical opinions found in Dr. M.E. Garcia's Medical Assessment was error. See Owens v. Heckler, 748 F.2d 1511, 1515-16 (11th Cir. 1984) ("A clear articulation of both fact and law is essential to our ability to

conduct a review that is both limited and meaningful.").

In light of this error, the undersigned recommends that the case be remanded to the Commissioner to reweigh the medical opinions found in Dr. M.E. Garcia's Medical Assessment.

**II. Whether the ALJ failed to properly assess Claimant's RFC.**

"The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96-8p.[19]  Further, "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Id.  "[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection which is not enough to enable [the Court] to conclude that the ALJ considered [Claimant's] medical condition as a whole." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  The ALJ's "opinion must describe his analysis *with enough detail to satisfy a reviewing court that he gave all of the relevant evidence before him its due regard.*" Turner ex rel. Turner v. Barnhart, 377 F. Supp. 2d 1165, 1168 (M.D. Ala. 2005) (emphasis added) (citing Cowart, 662 F.2d at 735).  When substantial evidence supports the ALJ's decision, it must be affirmed. See Crawford v. Commissioner of Social Security, 363 F.3d 1155, 1158-59 (11th Cir. 2004).

---

[19] SSRs are a series of precedential decisions relating to the programs administered by the SSA and are published under the authority of the Commissioner of Social Security. See http://ssa.gov/regulations/def-ssr.htm.

SSR 96-8p sets forth the SSA's policies and policy interpretations regarding the assessment of a claimant's RFC.   SSR 96-8p, 1996 WL 374184 (July 2, 1996).   According to this policy interpretation, the Commissioner is required to consider all relevant evidence in the case record in making the RFC determination. Id.; see also Lewis, 125 F.3d at 1440 ("The [RFC] is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments.") (citing 20 C.F.R. § 404.1545(a)).

In her discussion of Claimant's mental RFC, ALJ Wolfe explained that she "considered all symptoms and the extent to which [those] symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence . . . ." TR. 21.

As noted above, ALJ Wolfe determined that Claimant had the mental RFC to:

> perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except she can never be exposed to hazardous machinery/mechanical parts, unprotected heights, fumes, odors, dust, irritants, or loud noise. The claimant is frequently able to respond to changes and demands in a routine work setting; and able to interact with the public. She can frequently interact with the public, and performs best when work deals primarily with objects rather than people. The claimant is able to complete simple, routine, repetitive tasks, but not at a production rate or pace. She is able to frequently ignore or avoid distractions, including psychologically based symptoms while working, and while working with others without interrupting or distracting them. The claimant can maintain concentration for at least two hours at a time, but may be off task for 5 minutes per hour.

Id. at 20-21.

As the undersigned has recommended that the matter be remanded to the Commissioner to reweigh Dr. M.E. Garcia's medical opinions, the undersigned further recommends that the Commissioner also articulate a new mental RFC that takes into account the weight assigned to those medical opinions. See Story v. Colvin, No. 15-CV-331, 2016 WL 1055431, at *7 (M.D. Fla. Mar. 17, 2016) ("Based upon the conclusion reached above that the ALJ erred in failing to articulate the weight attributed to the [medical] opinions of [consultative examiners] . . . reversal is warranted for the Commissioner to reconsider his RFC finding in conjunction with his reconsideration of [those] doctors' respective opinions."); see also Castro v. Acting Comm'r of Soc. Sec., No. 18-CV-14455, 2019 WL 4072014, at *7-*9 (11th Cir. Aug. 29, 2019) (finding that the claimant's RFC was not supported by substantial evidence when the ALJ improperly discounted the treating physician's medical opinions).

**III. Whether the ALJ failed to properly assess Claimant's alleged symptoms and limitations.**

When considering a claimant's symptoms, the ALJ must follow a two-step process: "Step one is to determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms." Contreras-Zambrano v. Soc. Sec. Admin., Comm'r, 724 F. App'x 700, 703 (11th Cir. 2018) (citing SSR 16-3p, 82 Fed. Reg. 49,462, 49,463-64 (Oct. 25, 2017)). "Step two is to evaluate the intensity and persistence of an individuals' symptoms, such as pain, and determine the extent to which an individual's symptoms limit her ability to perform work-related activities." Id. (citing SSR 16-3p, 82 Fed. Reg. at 49,464-66). An ALJ considers "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [her] history, the signs and laboratory findings, and statements by [her] medical sources or other persons about how [her] symptoms affect [her]." 20 C.F.R. § 404.1529(c)(4). SSR 16-3p, effective October 25, 2017, clarified that "subjective symptom evaluation is not an examination of an individual's character." 82 Fed. Reg. at 49,463.

ALJ Wolfe found that:

The claimant is a 50-year old female with past relevant work as a telephone operator, stocker and tax preparer. She alleged in a May 2015 Disability Report that she stopped working on July 15, 2013 due to depression, severe migraines, anxiety and bipolar disorder. At the hearing, the claimant testified she had only completed the 8th grade. She stated she had crying spells and feelings of worthlessness, and stayed home all day laying down. She testified her migraine pain was 8-9 out of 10, lasted 3 days, and she put a bag of ice on her head until the pain went away. The claimant testified she was only taking 8 pills a month for pain, which was significantly less than the required dosage.

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

A comprehensive review of the entire medical record does not indicate that the claimant's impairments are as severe as alleged or that she is unable to do any work.

TR. 21 (citations omitted).

Given ALJ Wolfe's failure to assign a weight to the medical opinions found in Dr. M.E. Garcia's treatment notes and her improper discounting of the medical opinions found in Dr. M.E. Garcia's Medical Assessment, which addressed the intensity and persistence of Claimant's symptoms, the undersigned is unable to determine whether ALJ Wolfe's assessment of Claimant's alleged symptoms and limitations was rational and supported by substantial evidence. See Winschel, 631 F.3d at 1179; TR. 376-79, 526-32. Therefore, the undersigned recommends that the matter be remanded to the Commissioner to reassess Claimant's symptoms and limitations in light of Dr. M.E Garcia's medical opinions. See Winschel, 631 F.3d at 1179.

## RECOMMENDATION

Based on the foregoing considerations, the undersigned **RESPECTFULLY RECOMMENDS** that Claimant's Motion for Summary Judgment [D.E. 19] be **GRANTED**, the Commissioner's Motion for Summary Judgment [D.E. 20] be **DENIED**, and the Commissioner's decision be **REMANDED** to the Commissioner for further proceedings in accordance with this Report and Recommendation.

Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Darrin P. Gayles. Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein. See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993). Further, "failure to object in accordance with the provisions of [28 U.S.C.]

§ 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." See 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Miami, Florida this 26th day of November, 2019.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:     United States District Judge Darrin P. Gayles
        Counsel of Record